# CIRCUIT COURT NO. 2 OF BALTIMORE CITY

Filed April 21, 1891.

## THE BALTIMORE BASE BALL AND EXHIBITION COMPANY OF BALTIMORE CITY
### VS.
### CLARENCE L. CHILDS.

*Wm. Shepard Bryan, Jr., Bernard Carter and Charles H. Carter* for complainant.

*Thos. Ireland Elliott* for respondent.

PHELPS, J.—

The plaintiff is a corporation whose business is indicated by its title. The defendant is a professional baseball player, claimed to be of special skill and repute. Having first contracted to play with the plaintiff and shortly after with the Cleveland Club, this suit was commenced. Upon the facts set forth in the bill a preliminary injunction was issued and served, restraining Childs from playing with the Cleveland Club, or any other, during the period of his contract with the plaintiff, from April 1 to October 31, 1891. The defendant put in his answer claiming that his signature to the contract in question had been fraudently procured by false representations of William Barnie. The particulars are unnecessary, since they are contradicted by Barnie, and not sustained by any proof. Childs in fact failed to offer himself as a witness, and left the State. Considerable testimony was taken without him, and the case came up for final hearing. Although the argument lasted several days, the case has a short history, and will be found to turn on a single point, in order to apprehend which, it will be necessary at the outset to define the position of the contracting parties relatively to the National Agreement.

The corporation plaintiff is a member of a voluntary organization of professional baseball clubs, styled the American Association, working under a constitution and by-laws. Within the scope of the powers delegated by its constitution, the American Association is the authorized agent of the constituent clubs, and for its official acts within these lines the several clubs are responsible. Two other similar organizations of professional baseball clubs are called the National League and the Western Association. These three organizations entered into a compact on January 16, 1891, styled the National Agreement. The objects of the National Agreement, as declared by itself are, "to maintain the integrity of the national game of professional baseball, to provide the means for preserving harmony and for *adjusting all grievances and disputes*, to protect the large financial interests at stake and the *rights of individual clubs and players*, and to give the most solemn assurance that the game will at all times be concluded with strictest honesty and under *regulations of absolute justice to all concerned*," etc. By its terms certain requirements are imposed upon individual players, and certain rights and privileges, more or less valuable and important, are professed to be secured to them. For example, a board created by this instrument, and called the National Board, has power to arbitrate all disputes between clubs and players, to enforce payment of players' salaries, to appoint umpires and scorers, to compile and publish players' records, and to amend and enforce playing rules. Associations are prohibited from making rules "pertaining to the control, discipline and compensation of players" in conflict with the National Agreement.

Many other provisions might be cited, but the foregoing are quite sufficient to show that the National Agreement has for one of its objects the definition and enforcement of the rights of individual players, and that it is by no means a matter of indifference to a player, whether he is to play under the protection of the National Agreement or outside of it.

After this National Agreement was made, on January 27, 1891, the defendant signed the contract in controversy, of which the following is a copy:

I hereby agree to play baseball with the Baltimore Base Ball and Exhibition Company of Baltimore, Md., incorporated under the State laws of Maryland, for the sum of $2,300, commencing on the 1st day of April, 1891, and ending October 31, 1891.

I also agree to comply with all the requirements of what is known as the National Agreement, passed at New York, January 16, 1891, also the Constitution and Contracts of the American Association of Baseball Clubs.

(Signed)   CLARENCE L. CHILDS.

Witness:   W. BARNIE.

On the back of this contract the following was written:

Baltimore, Md., Jan. 26, 1891.

Received the sum of $200 as bonus for signing contract on other side of this paper.

(Signed)   CLARENCE L. CHILDS.

Upon the face of this paper several points are observable.

1. It is signed only by the defendant.

2. There is no express negative stipulation—that is, Childs does not in terms bind himself not to play with any other company.

3. It contains no particulars, except as to price and season. Nothing is said as to the place or places where the game is to be played, or as to traveling or other expenses, or as to necessary observances or discipline, or as to outfit, or as to who is to furnish it.

4. The player is made to bind himself to all the *requirements* of the National Agreement and of the constitution and contracts of the American Association, but is not expressly secured any of the *rights* and *privileges* to which players are entitled under those several instruments particularly the National Agreement.

With respect to the above points it is to be remarked:

1. That the payment of the $200 bonus, and the delivery of the contract to, and its acceptance by the plaintiff, will be assumed to be sufficient to bind the club on its part.

2. That a negative stipulation will be implied from the context and subject matter. (Gas Light Company vs. Coal Tar Company, 63 Md. 300.)

3. That the apparent want of certainty as to the particulars mentioned will be taken as supplemented by the complete specifications to be found in the written instruments referred to.

4. That the apparent want of mutuality will be deemed to be removed, and the contract rendered sufficiently mutual for enforcement by the equitable implication that the player is to be considered as entitled to all the rights of the players under the instruments referred to, and especially the National Agreement, as well as bound by all their requirements. In addition to this we have the blank form of the American Association contract, exhibited by the plaintiff as the form referred to in the papers signed by Childs, by the express terms of which the National Agreement is distinctly made a part of the contract, and the contract is declared to be made under and subject to the same. It is unnecessary to elaborate this point, since in reply to a question by the Court it was conceded in argument that, so long as the National Agreement continued in force, Childs must be regarded as intended under the contract to have the benefit of it as well as to be bound by its requirements.

It results from the foregoing that it is because and only because the National Agreement is to be taken as fully incorporated into the contract as its basis that the contract itself can be construed as sufficiently certain and sufficiently mutual for specific enforcement, whether affirmative or negatively.

A somewhat liberal construction of the instrument having thus succeeded in getting the contract into proper equitable form for judicial action, it will next be assumed that if nothing had been done by the plaintiff to alter, abridge or impair its effect, the plaintiff would, under the modern English and American authorities, be entitled to the negative specific enforcement of the contract by means of an injunction to restrain the defendant from its violation by employing himself elsewhere during the specified time.

(Lumly vs. Wagner, 1 D. M. & G. 604; Montague vs. Flockton, L. R. 16 Eq. 189; Daly vs. Smith, 49 How. Prac. 150; McCaul vs. Braham, 16 Fed. Rep. 37; 3 Pom. Eq., sec. 1343, Pom; Sp. Perf., sec. 24, 310, 312; Waterm Sp. Perf., sec. 117; Bisph. Eq., sec. 398.)

There is no Maryland adjudication directly in point, and there are quite strong expressions in an old case distinctly to the contrary. (Burton vs. Marshall, 4 Gill 488.)

The expressions referred to, however, are based upon English decisions which have since been expressly overruled in the leading case of Lumly versus Wagner, above cited, and the Chancellor's judgment in this latter case has been referred to in terms of at least qualified approval in Hahn vs. Concordia, 42 Md. 460.

The language of the Court in this case evinces a marked tendency towards drifting into the current of modern authority, yearly swelling in volume. The same tendency is perceptible in a still later decision—(Gas Light Co. vs. Coal Tar Co., 63 Md. 285.) In several States, Courts of first instance have quite recently recognized the modern English doctrine that a contract for personal services requiring special aptitude, otherwise objectionable, may be negatively enforced by injunction. And this doctrine has been specially applied to the contracts of professional baseball players. Kansas City Club vs. Pickett, 47 Leg. Int. 212; Metropolitan Exh. Co. vs. Ward, N. Y. Supreme Court, 28, January, 1891.

Among the later American decisions is one by the United States Circuit Court for the Southern District of New York which concisely states the principle and its qualification as follows: "Although equity will not ordinarily attempt to enforce contracts which cannot be carried out by the machinery of a Court, it may nevertheless practically accomplish the same end by enjoining the breach of a negative promise; and this will be done whenever the contract is one of which the Court would decree specific performance, if by such decree its observance by the party refusing to perform could be practically enforced." Metropolitan Exhibition Co. vs. Ewing, VII, 3, Lawyer's Rep., Ann., 381.

While in this class of cases the only relief sought is the preventive relief of injunction, the rules applicable are generally held to be the same which govern ordinary cases of specific performance. (63 Md. 298.) If there is any difference, it is that Courts, when called on to exert this delicate and extraordinary power, are obliged to proceed with even more than the usual caution. "There is no branch of equity jurisdiction which requires more discretion in the exercise of it." Daly vs. Smith, 49 How, Pr., 161; Iron Age Co. vs. W. U. Tel. Co., 83 Ala. 508.

The contract was executed, as has been seen, on January 26. On February 16 Childs broke his contract with the plaintiff by entering into an inconsistent agreement with the Cleveland Club. On March 2 he notified the plaintiff of his intention not to fulfil his bargain with the latter, assigning no other reason for his conduct, so far as the evidence discloses, than that he could do better. He tendered at the same time a return of the $200 bonus, which was promptly refused.

If this were all, it might be conceded that the plaintiff would be entitled to maintain the injunction. But this is not all. On February 18 a formal notice, signed by W. Barnie, vice-president of the American Association, was addressed to N. E. Young, Secretary to the National Board, to the effect and in the terms following:

"You are hereby notified that the American Association of Baseball clubs, at a meeting held at the Murray Hill Hotel, N. Y., February 17, 1891, unanimously adopted the following resolution offered by H. R. Vonderhorst, president of the Baltimore Club:

"*Resolved*, That the American Association *withdraws from the National Agreement*, said action to take effect on this date."

This notice was promptly communicated to the National Board, which, on February 21, adopted an order in effect recognizing the withdrawal as valid while commenting upon it as unwise. They say, "the resulting consequences of this ill-advised action must rest on that body. By its own action it has annulled the approval of the contracts its clubs have made with players, and its clubs have released all their players from reservation."

This, of course, is merely an *ex parte* opinion, having no attribute of a judicial determination, and not binding upon the plaintiff. The purpose for which it is used is simply to show an admission by the only party invested to contest it that the adverse right of withdrawal claimed and exercised by the American Association was within the scope of its powers. If within the scope of its agency then the act was binding upon the constituent clubs. It will be observed, in fact, that the Baltimore Club, by its officers, took an active and leading part in the transaction. For this action of the American Association the plaintiff must therefore be held responsible. For all the purposes of this controversy the National Agreement must be considered as dissolved by the act of the plaintiff. What, then, becomes of the contract with Childs, made, as has been seen, upon the basis of the National Agreement? Evidently, its identity is destroyed.

The contract which is now sought to be indirectly or negatively enforced is an entirely different contract from that signed. It is a contract with the National agreement stricken out. With respect to an agreement so altered, the defendant can say with truth, *non in haec foedera veni*. The Court can enforce the identical contract actually made and no other. It has no power to amend the contract, on the motion of one of the parties, and enforce it in a fractional form. Anson on Contracts, 306; O'Brien vs. Pentz, 48 Md. 563.

By its own act, the plaintiff is disabled from performing its part of the contract. The true construction of this instrument has been shown to be such as in effect to secure to the defendant a player's right under the National Agreement, and it has been seen in detail what some of them are. The club is not now in position to afford the player the sort of umpires and scorers and rules and record-keepers, and arbitration and enforcement of salary impliedly stipulated for. Unless a plaintiff is able to perform his part, he cannot ask the Court to enforce performance by the defendant. Carswell vs. Walsh, 70 Md. 507; Fry Spec. P., sec. 903.

Unless this difficulty can be satisfactorily disposed of it is plainly fatal to the plaintiff's case. How has it been met? The National Agreement has a clause providing for its amendment at any time by a majority of the Associations composing it. It is argued that, by this power of amendment, one provision after another could be repealed until the entire instrument might be obliterated.

It is claimed that no more has been done in effect by the withdrawal of the American Association. This argument loses sight of the difference between orderly amendment and nullification, between the conventional action of a majority and the revolutionary action of a minority asserting its reserved rights. A valid amendment only was contemplated, and to a valid amendment the action of a majority is necessary.

Again it is suggested that no such defense is relied on in the answer. That is true, and it is also true that the important and material fact of the recent withdrawal of the American Association from the National Agreement is not mentioned in the bill. This is the more remarkable, since not only was the fact well known to the plaintiff, but, as has been seen, its officers took a leading part in the movement.

As an excuse for this very conspicuous omission we are told that the plaintiff did not consider the fact material. But the point is, not what the parties may think material, but what the Court thinks material. "In all *ex parte* applications of this kind, when the Court is asked to interfere by a process so summary in its character and so liable, therefore, to be abused, it is the duty of the complainant to make a *full and candid disclosure* of all the facts within his knowledge touching the subject matter in regard to which relief is prayed." If he abstains from stating facts which the Court thinks material to enable it to form its judgment, he disentitles himself to that relief which he asks the Court to grant. (Sprigg vs. W. Tel. Co., 46 Md. 74, 75).

It is quite plain that if the *ex parte* affidavit upon which the preliminary injunction was granted had called the Court's attention, as it should have done, to the fact that the National Agreement, referred to in the paper exhibited had been dissolved in the manner stated, the summary process asked for would have been refused unless the bill had further set forth facts, going to show that the withdrawal referred to had taken place with the knowledge and consent of the defendant, prior or subsequent, express or implied.

No such allegation being found in the bill, there is, of course, no foundation for the argument that Childs must be presumed to have had notice of the fact in question as a matter of public notoriety, and with that knowledge failed to rescind the contract on that ground. Notice is a fact that should have been specifically charged, if reliance was intended to be placed on it (Sto. Eq. Pl., Sec. 263).

Nor is there foundation for the argument that the defendant's violation of his contract for other reasons, or for no reasons, was a waiver of the objections referred to. Waiver presupposes knowledge, and the fact of knowledge, as has been seen, is not in issue under the pleadings. Apart from that it has been shown that the National Agreement was as much the basis of the contract as the money consideration, and upon no principle can Childs be taken to have waived the $2,300. He cannot be indirectly compelled to play *gratis*, nor, by the same token, can he be indirectly made to play outside the protection of the National Agreement. No matter how badly a party may have acted a Court of equity cannot inflict a forfeiture. (68 Md. 306; 54 Md. 24).

Childs unquestionably broke the contract he actually made, and for that breach he became legally liable in damages. But for that breach he cannot be punished by restraining him from the breach of another contract which he never made. Outside the formidable power of fine and imprisonment to enforce its own orders, *in personam*, the same powerful machinery the plaintiff is here endeavoring to set in motion—this is not a penal tribunal. It may see nothing to approve and everything to condemn in the conduct of a party, but has no power to punish whether by confiscating wages or by forfeiting contract rights.

The case would have been altogether different had it been alleged and proved that Childs, after full knowledge of the alteration in the contract, had retained the bonus and continued to permit the club to depend upon his services, thereby losing opportunities to fill his place. It would then have been a fraud on his part if he had attempted to make that alteration a pretext for escaping from his obligation. As it is, there is no such case of estoppel.

The plaintiff must be left to its remedy at law. Its relief in equity it has lost by its own voluntary act. The case furnishes another illustration of the well-worn maxim: "He who seeks must do equity," and must come with "clean hands."

The motion to dissolve the injunction must be allowed, and a decree will be signed dismissing the bill.